# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

## UNITED STATES

**v.**

## Senior Master Sergeant ANDREW J. HENNE
## United States Air Force

## ACM 38334

## 30 July 2014

Sentence adjudged 10 January 2013 by GCM convened at Aviano Air Base, Italy.  Military Judge:  Jefferson B. Brown (sitting alone).

Approved Sentence:  Confinement for 4 years and reduction to E-4.

Appellate Counsel for the Appellant:  Captain Nicholas D. Carter.

Appellate Counsel for the United States:  Colonel Don M. Christensen; Major Roberto Ramírez; and Gerald R. Bruce, Esquire.

Before

HECKER, SANTORO, and TELLER
Appellate Military Judges

OPINION OF THE COURT

This opinion is subject to editorial correction before final release.

SANTORO, Judge:

A military judge sitting as a general court-martial convicted the appellant, pursuant to his pleas, of two specifications of communicating indecent language to a minor, in violation of Article 134, UCMJ, 10 U.S.C. § 934.  Contrary to his pleas, the appellant was convicted of two specifications of making a false official statement; one specification of conduct prejudicial to good order and discipline and service discrediting for wrongfully "inviting and coaxing" a child under 16 to engage in sexual contact; and one specification of obstruction of justice, in violation of Articles 107 and 134, UCMJ,

10 U.S.C. §§ 907, 934.[1]  The adjudged sentence was confinement for 4 years and reduction to E-3.  The convening authority mitigated the reduction to E-4 but otherwise approved the sentence.

Before us, the appellant asserts: (1) his sentence to 4 years of confinement is inappropriately severe; (2) the specification alleging that he wrongfully invited and coaxed a child under 16 to engage in sexual contact fails to state an offense; and (3) the specifications alleging that he communicated indecent language to a minor fail to state offenses.  We disagree and affirm.

*Background*

The appellant, a senior non-commissioned officer and first sergeant, befriended MW, the 13-year-old daughter of a fellow service member and the appellant's teenage daughter's friend.  Over a four-month period, the appellant and MW participated in events with their families, discussed problems she was having at home, and exchanged Facebook messages, telephone calls, and text messages.  MW called the appellant "Mr. Andy."  Both the appellant and MW described his relationship with her as being that of a "father figure."

Early Facebook conversations between the appellant and MW were innocuous, but later they grew increasingly suggestive.  After the appellant told MW he was cold and she replied that he probably had a heater in his house, he told her he preferred "body heat" and "snuggling."  In other conversations, he told her that his preferred underwear was boxer shorts, he asked her what she was wearing, and he made suggestions about what clothes he preferred she wear.

One evening, after learning that MW's parents were not home, the appellant offered to pick her up and bring her to his house.  He told her he was not dressed, "suppose[d]" he could fix that, and that once she got there he would hold her "long n close."  He then suggested ways that MW could contact her mother to request permission to go to the appellant's house.  As the discussion continued, the appellant again told MW how cold he was.  When MW said her feet were always cold, the appellant said, "[S]o we'll be good together," and "time to snuggle."  He also said, "[Yo]u need me."

The appellant asked whether MW's mother would know if she left the house without permission. MW said no, but that she (MW) was afraid of falling asleep at the appellant's house and not getting home before her mother returned from her overnight work shift.  The appellant asked MW if she thought she would fall asleep at his house.  When she said yes, he asked her, "[W]here?"  MW replied, "Wait… What??? I would fall

[1]  The military judge acquitted the appellant of making a third false official statement; violation of a regulation on authorized government telephone use; and soliciting another to commit an offense, alleged as violations of Articles 92, 107, and 134, UCMJ, 10 U.S.C. §§ 892, 907, 934.

asleep at your house." The appellant said, "[A]h. [I]t's comfy here." He told MW he was warm and, after MW indicated she was cold, said, "[H]mm." She asked, "What?" He replied, "[H]ow to warm [yo]u up." When MW said, "Haha," the appellant apologized, saying "[S]ry [sic]; too much." That evening's conversation ended shortly thereafter.

The following day, the Facebook conversation resumed, and MW made comments that the appellant apparently perceived as potentially suicidal. He said he would miss her, asked her what was wrong, offered her "cuddle time," and resumed his efforts to get her to his house. He said, "[T]oo bad [yo]u erent [sic] here," "stil [sic] in need of cuddles," and "[I] could come get [yo]u." Again MW said she did not know whether she could get permission, and the appellant questioned whether anyone would know if he came to get her.

MW told the appellant that she could not leave the house because she had been cleaning all day and needed to shower. After telling MW that he needed to shower as well, the appellant added, "[S]ave water shower with a friend." MW replied, "WHOA. umm…. umm… awkward." The appellant apologized, telling her it was "a saying," and that he "didn't mean to offend" her but make her smile.

The shower discussion resumed. The appellant again said he needed to be warm and "that[']s why cuddles [a]r[e] so important." He told MW he was going to shower and asked if she wanted to come to his house. When she said yes, he replied, "[M]aybe I'll steal [yo]u," and "could lay here n['] cuddle." The appellant suggested that after MW showered she put on a dress but bring her pajamas. After MW sent him a photograph of one of her dresses, they discussed which one would show off her legs and what shoes she should wear.

The conversation then turned more overtly sexual. The appellant said, "[S]miling when something dsirty [sic] comes to your mind." When MW said, "[I] do that all the time," he asked, "[W]hat comes to your mind[?]" She replied, "[W]hat starts with p and ends with orn…. popcorn!" They then discussed movies with veiled references to popcorn and pornography. The appellant told her that he had "all kinds" of movies at his house, including those that start with "p" and end with "orn," and said he would "wear nothing" if she came to his house.

After the appellant pressed MW to tell him what else they would do if she came to his house, she said she did not have any other ideas. He said, "[I]m old [I] have a few" and that "some might raise [yo]ur eyebrows." He told her his thoughts went to "very pleasant places," but he was not sure he should tell her what they were. When she encouraged him to tell her, he responded, "[J]ust pleasant places; where there are short dresses n['] long legs," and "where a girl n['] a guy…." MW told the appellant he was making her feel like a six-year-old, and that he should stop "sugar coating it."

ACM 38334

The exchanges became even more sexually-charged. Eventually, the appellant asked MW, "[Yo]u want to climb on[?]" She responded, "[H]ell yeah." He repeatedly asked her to tell him what she wanted to "climb on." She eventually answered, "[Y]our penis." He asked whether she would like it; she said she did not know because she had "never seen it." The appellant asked whether she had ever seen a penis. When she said yes, he told her she should call him. After further discussion about whether she could call the appellant without getting caught, he asked whether she knew how to delete their conversation from Facebook. He told her to "delete as [yo]u go," especially if anyone else had access to her account. They exchanged several more suggestive messages and ended the conversation for the evening.

The next day, the appellant quickly returned to the sexual innuendo and made more comments about his warmth. MW told him that he was confusing her, and he changed the conversation to his children and MW's relationships with her parents and friends. The appellant soon returned to innuendo, saying: "I'm gonna sit here with my warmth," and "[yo]u know what I mean." MW said she did not know what he meant. The appellant said, "[I']m very warm[,] excited." MW asked, "[B]oner?" He replied, "[U]h huh," then told her she was smart and that "being smart is a good thing." He then told her he "need[ed] to take care of this . . . warmth." After making an allusion to masturbating, he asked whether it offended MW. Before the conversation concluded, the appellant reminded MW to "delete all this . . . . just to be safe."

The following day, the appellant initiated another conversation with MW. She asked what he wanted. He said, "[N]othing just sayin['] hi." MW responded, "Mmmmmm not likely. Look pedophile dint [sic] talk to me anymore or I'll tell someone who counts and get you in a lot of trouble. Got it?" The appellant replied, "[G]ot it; I'm sorry."

Realizing his conduct might be reported to authorities, the appellant asked his son to lie if questioned by investigators. He told his son to tell anyone who asked that it was he (the son) who had the conversation with MW on Facebook while using the appellant's account. When the appellant was eventually questioned by law enforcement, he told the false story that his son had hacked into his Facebook account. He also told investigators that he had never invited MW to his house.

*Sentence Appropriateness*

This Court reviews sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006); *United States v. Baier*, 60 M.J. 382, 383–84 (C.A.A.F. 2005). We "may affirm only such findings of guilty and the sentence or such part or amount of the sentence, as [we find] correct in law and fact and determine[], on the basis of the entire record, should be approved." Article 66(c), UCMJ, 10 U.S.C. § 866(c).

"We assess sentence appropriateness by considering the . . . appellant, the nature and seriousness of the offenses, the appellant's record of service, and all matters contained in the record of trial." *United States v. Bare*, 63 M.J. 707, 714 (A.F. Ct. Crim. App. 2006); *see also United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982).

While we have a great deal of discretion in determining whether a particular sentence is appropriate, we are not authorized to engage in exercises of clemency. *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999); *United States v. Healy*, 26 M.J. 394, 395–96 (C.M.A. 1988). Moreover, while we are required to examine sentence disparities in closely related cases, we are not required to do so in other cases. *United States v. Christian*, 63 M.J. 714, 717 (A.F. Ct. Crim. App. 2006) (citing *United States v. Wacha*, 55 M.J. 266, 267–68 (C.A.A.F. 2001)), *pet. granted on other grounds*, 65 M.J. 320 (C.A.A.F. 2007).

The maximum sentence which could be imposed was a dishonorable discharge, confinement for 14 years and 4 months, and reduction to E-1. The approved sentence of no discharge, confinement for 4 years, and reduction to E-3 was clearly within the discretion of the convening authority.

The appellant's military service until his commission of these offenses appears to have been exceptional, including six overseas tours and five combat tours. He presented over 40 statements attesting to his character, volunteer and other service, and the strength of his military career. The defense submitted evidence of the present and future value of the appellant's military retirement.

The evidence in aggravation, however, is also compelling. MW viewed the appellant as a surrogate father and told him such things as, "[Y]ou're basically my dad," "[y]ou're a father figure," "[y]ou're a parent that I need," "I know you can help," and "[y]ou're much better than my father could ever be." The appellant acknowledged his role in MW's life, even telling her, "[Y]ou're a wonderful daughter." Despite his knowledge of her age, the fact that she looked up to him and relied on him for counseling and support, and her ongoing emotional issues, he abandoned his role as both an adult and mentor for his own gratification. His conduct made MW less trusting of men, military members, and first sergeants. Additionally, the appellant had received a letter of reprimand for engaging in inappropriate Facebook conversations with a different 13-year-old girl, the daughter of a deployed military member.

We have given individualized consideration to this appellant and the facts of the case. We conclude that a sentence of confinement for 4 years and reduction to E-4 is not inappropriately severe for a senior non-commissioned officer and first sergeant who knowingly engaged in inappropriate online sexual conversations with a fellow service member's minor child, repeatedly asked her to come to his home to engage in sexual contact, lied about it to investigators, and told his son to do the same.

*Failure to State Offense*

Whether a specification fails to state an offense is a question of law that we review de novo. *United States v. Crafter*, 64 M.J. 209, 211 (C.A.A.F. 2006). "A specification states an offense if it alleges, either expressly or by implication, every element of the offense, so as to give the accused *notice* and *protection against double jeopardy*." *Id.* (emphasis added). "A specification that is susceptible to multiple meanings is different from a specification that is facially deficient." *Id.*

## A. Inviting and Coaxing a Minor

Specification 1 of Charge III alleged that the appellant did "knowingly and wrongfully invite and coax [MW], a child under the age of 16 years, to engage in sexual acts and sexual contact" which conduct, under the circumstances, was prejudicial to good order and discipline and service discrediting.[2] The appellant alleges for the first time on appeal that the phrase "invite and coax" is vague and fails to provide notice of the offense against which he must defend.

"The military is a notice pleading jurisdiction." *United States v. Fosler*, 70 M.J. 225, 229 (C.A.A.F. 2011) (citing *United States v. Sell*, 11 C.M.R. 202, 206 (C.M.A. 1953)). "A specification is sufficient if it alleges every element of the charged offense expressly or by necessary implication." Rule for Courts-Martial (R.C.M.) 307(c)(3). In *United States v. Humphries*, 71 M.J. 209, 212 (C.A.A.F. 2012), our superior court noted that "[t]he existence of error alone does not dictate that relief in the form of a dismissal is available" in the absence of a structural error. A defective specification does not constitute structural error. *Id.* The Court also stated that even though R.C.M. 907(b)(1)(B) appears to require dismissal when a specification fails to state an offense, a defective specification does not necessarily warrant automatic dismissal. *Humphries*, 71 M.J. at 212. While an appellant can challenge the fact that a charge fails to allege an essential element at any time in the proceedings, when the issue is first raised on appeal, as it is here, a specification will only be dismissed where there is plain error. *Id.* at 213.

In applying a plain error analysis to a case involving whether a specification fails to state an offense, "[the] [a]ppellant has the burden of demonstrating that: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the accused." *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011) (citing *United States v. Powell*, 49 M.J. 460, 463–65 (C.A.A.F. 1998)); *see also United States v. Cotton*, 535 U.S. 625, 631–32 (2002); *United States v. Carter*, 61 M.J. 30, 33 (C.A.A.F. 2005); *United States v. Carpenter*, 51 M.J. 393, 396 (C.A.A.F. 1999).

---

[2] In finding the appellant guilty of this offense, the military judge excepted the words "sexual acts and".

We are not persuaded that there was error, plain or otherwise. The words "invite" and "coax" are commonly used words with easily understood meanings. Neither word is a legal term of art as used in the specification. There was no request for a bill of particulars under R.C.M. 906(b)(6), motion to dismiss for failure to state an offense under R.C.M. 907(b)(1)(B), or motion for a finding of not guilty at the conclusion of the Government's case-in-chief under R.C.M. 917. Although the failure to request relief on any of those grounds is not dispositive of the issue before us, it undercuts the appellant's argument that he lacked notice of the offense charged.

The appellant further argues that the specification improperly does not require that his invitation or coaxing be "valid, serious, or show true intent" that he would actually engage in such conduct. He cites no authority for his contention that a "true intent" must be charged and proven to sustain a conviction under Article 134, UCMJ. All that the Article requires is that the charged conduct be prejudicial to good order and discipline or service discrediting. In this case, intent actually to engage in sexual contact was neither alleged nor required to be proved. *See United States v. Humphrys*, 22 C.M.R. 96 (C.M.A. 1956) (when assessing whether a threat has been communicated in violation of Article 134, UCMJ, it is the intent expressed in the words used, not the intent in the mind of the declarant); *see also United States v. Schell*, 72 M.J. 339 (C.A.A.F. 2013) (in construing 18 U.S.C. §2422(b), when plain language alleges "persuades, induces, entices, or coerces" sexual activity, proof of actual intent to engage in the sexual activity is not required).

We therefore conclude that the specification stated an offense and reject this assignment of error.

### B. Indecent Language

The appellant asserts that both indecent language specifications were defective. Specification 2 of Charge III alleged that the appellant did, "in writing communicate to [MW], a child under the age of 16 years, certain indecent language, to wit: asking if and acknowledging that she wants to 'climb on' his penis or words to that effect," which conduct was prejudicial to good order and discipline and service discrediting. Specification 3 of Charge III alleged that the appellant did, "in writing communicate to [MW], a child under the age of 16 years, certain indecent language, to wit: acknowledging that he had a 'boner' and wanted to masturbate," which conduct was prejudicial to good order and discipline and service discrediting.

Therefore, the elements for each specification were:

(1) That at the date and place alleged, the appellant communicated the quoted language to MW, who was under 16;

(2) That the language was indecent; and

(3) That, under the circumstances, the conduct was prejudicial to good order and discipline or service discrediting.

*Manual for Courts-Martial, United States*, Part IV, ¶ 89.b. (2012 ed.).

With respect to each specification, the appellant alleges that what he pled guilty to was "acknowledging the language used by another" as opposed to his admission that he himself used the charged language. We first note that the appellant is not challenging the sufficiency of the guilty plea inquiry or the military judge's decision to accept his guilty plea,[3] but rather whether the specification, as drafted, states an offense.

Prior to accepting the appellant's guilty plea, the military judge correctly advised him of the elements of each offense. He also correctly defined "indecent language" and told the appellant:

> Language is indecent if it tends reasonably to corrupt morals or incite libidinous thoughts, that is lustful, lewd, or salacious connation [sic], *either expressly or by implication*, from the circumstances under which it was spoken, or in this case, written. The test is whether the particular language employed is calculated to corrupt the morals or incite sexual thought and *not whether the words themselves are impure*.

(emphasis added).

The appellant never sought a bill of particulars nor did he challenge this specification at trial. Instead, after being properly instructed on the applicable law, he acknowledged that the charged conduct met the definition of communicating indecent language.

Our superior court's decision in *United States v. Ballan*, 71 M.J. 28 (C.A.A.F. 2012), is instructive. In *Ballan*, the accused pled guilty to an Article 134, UCMJ, specification that did not allege the so-called "terminal element"; that is, that the conduct was prejudicial to good order and discipline or service discrediting. Despite the terminal element's absence from the specification, the military judge nonetheless advised the accused of that element and the applicable definitions during the plea colloquy. The accused thereafter acknowledged that his conduct met the definitions, and the military judge accepted his plea. On appeal, the Court of Appeals for the Armed Forces held:

---

[3] A military judge's decision to accept a guilty plea will only be disturbed if there is a "substantial basis" in law and fact for questioning the guilty plea. *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008).

There was no prejudice to the substantial rights of Appellant [in the military judge's acceptance of his plea]; this case, involving a defective specification and a proper plea inquiry, is distinguishable from a contested case involving a defective specification. In cases like this one, any notice issues or potential for prejudice are cured while there is still ample opportunity either for a change in tactics or for the accused to withdraw from the plea completely . . . . In a contested case, on the other hand, there is no equivalent, timely cure that would necessarily be present . . . .

*Ballan*, 71 M.J. at 35–36.

The appellant cites no authority for his proposition that alleging a military member "acknowledged" the language of another person is insufficient to state an offense. Each specification alleged that the appellant "did" an affirmative act—ask and acknowledge, or acknowledge—and that the language he used in his affirmative act was indecent. We therefore conclude that the specification was not defective. Assuming *arguendo* that it was, we would nonetheless apply the *Ballan* rationale and hold that in this case, where the appellant was advised of the elements and definitions of the offense before his unconditional guilty plea was accepted, he suffered no prejudice to his substantial rights.

## *Conclusion*

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and the sentence are

AFFIRMED.

FOR THE COURT

STEVEN LUCAS
Clerk of the Court